315-0446, People of the State of Illinois, appellee by Thomas Arado, v. Harvey Bland Jr., appellant by Chan Yoon. Mr. Yoon. May it please the Court, Counsel. Good afternoon, Your Honors. My name is Chan Yoon, and I represent the appellant, Harvey Bland, in this matter. This afternoon I'd like to discuss or focus on Issue No. 1 from the briefs, but I'm more than happy to answer any questions Your Honors may have concerning Issue No. 2. So in this case, the police violated Harvey Bland's Fourth Amendment rights by prolonging a routine traffic stop despite the fact that there are no articulable signs of criminal activity. Specifically, what happened here is that Officer Lipkaman and his trainee, Officer Taylor, stopped Harvey for driving with his headlights off. They completed the tasks that are related to the traffic stop, and those things such as talking to the driver and looking for outstanding warrants. And they found that Harvey did have a prior arrest for theft in Iowa. And then Taylor even began writing the traffic violation. But at that moment, Officer Lipkaman told him to discard the ticket because there are other things pressing at the time. And at that moment, the officers decided to prolong the search. Taylor called for backup, and when backup arrived, the officers re-approached Harvey and asked to search the car. And although Harvey consented to the search, this fact is irrelevant to the analysis because the officers had already violated his constitutional rights by deciding to prolong the traffic stop without any reasonable suspicion based on a mere hunch. And significantly, Officer Lipkaman admitted to this at the hearing on the motion to suppress. He stated, and I quote, My suspicions were with what Officer Taylor had told me and with what we had learned through the criminal history that there may be something else going on. In other words, he had a hunch that something else was going on. He did not base it on an articulable sign of criminal activity. Therefore, the records from the hearing establishes that Lipkaman or the officers based the decision to prolong the traffic stop based on feeling rather than facts, rather than signs of criminal activity. And basically what they did is they undertook a fishing expedition to uncover evidence of a crime. And what Rodriguez v. U.S. tells us is that when a traffic stop is completed, when all the tests related to that traffic stop are completed, then the officers must end the stop unless they have reasonable suspicion. And here they did not, obviously just from what Officer Lipkaman told us. Now, Officer Taylor stated that he saw that Harvey was acting nervous and of course they had looked up his criminal background and they realized that he had a prior arrest for theft. Let me ask you, was that a conviction? As far as the record states, it's just an arrest. So that's what we have from the record. I'm not sure if it was a conviction. Do we know when the arrest, when the charge was? Not from the record. He's a pretty young man, though. He was around 19 at the time of the offense. So I can't imagine it was very, I mean, it happened a long time ago. But again, that fact and the fact that he was acting nervous is irrelevant, or not irrelevant, but those things that Taylor observed, the nervousness, the fact that he had a criminal background, those things aren't sufficient to support a finding of reasonable suspicion in any case. And this court held that in Peel v. Davenport. And this was a third district, or this court decided this in 2009. And in Davenport, we have a very similar set of facts. We have the police stopping a car on the highway and the police officers observed that the passengers in the car were acting nervous and they also found that the defendant in that case had a criminal background related to narcotics. However, this court held that those two factors were not sufficient to support a finding of reasonable suspicion. And in that case, what happened was they prolonged the stop for a dog sniff. Given the similar facts that we have here, that the officers based their decision on the fact that Taylor was acting nervous and that he had a minor arrest for theft, the same result is appropriate here. I would also like to address the TV. The TV was intended in the backseat, but the TV itself is an innocent object. There's nothing inherently criminal about having a TV unboxed in the backseat. And Officer Lipkerman plainly stated at the hearing that he was not suspicious of the TV when he first approached the car. So that TV shouldn't have given rise to any sort of reasonable suspicion. Now, Officer Taylor stated that he found it odd that the TV was unboxed in the backseat. But he never testified at that point that he had suspicion or he suspected that the TV was related to criminal activity. And it's also important to note that it was Officer Taylor who began writing the traffic violation in anticipation of ending the traffic stop. But he only discarded the ticket after Lipkerman told him that something else was going on. And I would just like to emphasize that fact, that Lipkerman is stating honestly at the hearing that he didn't know what was going on in terms of criminal activity, but he had a feeling that something was going on, or in other words, a hunch. And the case law establishes that reasonable suspicion cannot be based on a mere hunch. And for those reasons— Are you saying there's no specific articulable facts? I would say, yes, there are no articulable facts related to criminal activity. You have the driver acting nervous. You have a TV, an innocent object, in the backseat of the car. And you have knowledge that the driver has a minor criminal background. Now, those three facts put together are not sufficient to support a finding of reasonable suspicion. Because acting nervous in itself when you encounter the police, that's not really anything unusual. And courts have recognized this as well. And people be steward. And I cited this case in my opening brief, but it's an older case from 1993. The court states, Nervousness is not a characteristic that generally invokes reasonable suspicion, especially when one is stopped by the police for a traffic violation. So just because someone's acting nervous, just because he has a minor criminal background and he has an appliance unboxed in his backseat, that doesn't mean the police can, Oh, look, now let's prolong the search. Let's go beyond the scope of the traffic stop and see what we can find. That is a violation of the Fourth Amendment. And that's what occurred in this case. So I would just ask this court to reverse Harvey's conviction, because if the motion to suppress was granted, then the evidence that the state relied on, namely the TV and Harvey's confession, would be suppressed. And Harvey's conviction for theft over $300 can't be sustained without that evidence. So if you all have no other questions. What about your second issue? So the second issue, briefly, has to do with the public defender fee. The statute, Section 113-3.1a of the Criminal Code, or Code of Criminal Procedures, states that in order to impose the public defender fee, there must be a hearing on the defendant's ability to pay. In this case, there was no hearing. So, you know, there are similar cases where this has occurred. We have Aguiar, Alicorn, and Gutierrez. They state that the correct remedy is to vacate the fee. I realize that the state has argued that Harvey waived the fee because he agreed to the sentencing order, where the public defender fee was a condition of the probation. But he never was advised that he had a right to a hearing. And I think what's noteworthy about the state's argument is the case that they rely on, people via Dunlap. And in Dunlap, the court found that there was a waiver, but because the court actually had considered the defendant's ability to pay. And I'm just going to quote this quickly. But the court stated, you do have the trial court in Dunlap, you do have the ability to work, although I understand you've been in jail for some time, but you've worked in the past. So I'm considering a $400 public defender assessment, considering we had a jury trial in this case. But this is your opportunity, if you've got any evidence or anything you want to say, on whether or not I should impose that. To which the defendant responded, no. So in Dunlap, we have a complete different set of facts. We actually have the court stating on the record that he considered the defendant's ability to pay, and the defendant saying no. There's no conversation like this in this case, at least on the record. And I would just submit to this court that because there was no hearing, because Harvey was never advised of his right to a hearing, that he did not waive his right to a hearing on the public defender fee. And the correct remedy here is to vacate that fee. Are you aware of a Fourth District case in 09 decision, people v. Evans? You didn't cite it? Nor did opposing counsel? No, I am not aware of that case, Your Honor. But if you would like me to look it up and submit a simple memo for you. No, I'll ask opposing counsel the same question. All right. Well, if Your Honors have no other questions, that's all I have. I guess not. Thank you. Thank you. Thank you. Mr. Nguyen and Mr. Arado. May it please the court. Good afternoon, Your Honor, counsel. No, I'm not aware of it. You bet. Yes, I am. Apparently so. Taking that first, the second issue first, then, our position had been, well, was, anyway, that gun lap is certainly sufficient to find that there is waiver in the public defender fee. What actually was argued was that there was actual waiver, not simply forfeiture, because he agreed to the sentence. What was argued in the reply brief was that, no, you can't even have waiver. It was citing to people versus love. And we would say, point out that in love, the judge sua sponte imposed the public defender fee without giving the defendant any opportunity to consider or object. In this case, as we put forth exactly what happened in this case in our brief, the prosecutor presented that we have an agreed sentencing order. Judge went through it. Judge went through it. Asked the defendant specifically, is this your understanding of the agreed sentencing order? And he said yes. And therefore, it is our position that it's clear waiver. So as to the first issue, the. As to your question, Justice, we don't know what, when or when or whether it is a conviction for the burglary, just that he had a burglary arrest, at least. So our position is that there was reasonable or typical suspicion that arose after the traffic stopped. So when Officer Taylor approached the vehicle and observed the television, that in itself perhaps was not an issue. But he testified that when he asked the defendant about the TV, he said, well, I just bought it at Wal-Mart. And then he appeared very nervous, would not make eye contact with Officer Taylor. And there's some other testimony. And it's not clear. And the judge, the trial judge, in making his decision says, you know, the time frame in this case is not real clear. It was asked the defendant at some point whether he had any receipts. And he didn't have a receipt. He told Officer Morris that he paid three hundred and eighty three dollars for it. And then later told Morris or Lipscomb that he paid eight hundred and something dollars for the TV. So there is some some question as to whether there's some suspicious activity going on in this case. What suspicious activity? The activity of potentially that the defendant had stolen the television in the vehicle. So you're saying that any time the police stop somebody and they have a large item in their car, that that's reasonable suspicion for them to think that maybe they need to ask more questions? Well, asking questions is not illegal by the officers. It's when they ask the questions and they get answers that are peculiar or raises suspicion that they can continue to investigate. But you have to have some reason for asking the initial question, don't you? You can. No, they can ask questions that are unrelated to the stop. People versus Collins case that we cite goes through that. It's not an issue that just because it's not directly related to the stop, it's not something that can't be asked. So if I'm driving down the street and I get stopped for a traffic violation and I'm nervous, as any reasonable person would be for being stopped by the police and I have a TV set in the back of my car, that's something that generates a reason to be suspicious of me? Not in and of itself. But if the officer asks the defendant, as in this case, where did you get the TV? I bought it. I just bought it. And then he is acting nervous and he gives inconsistent, otherwise inconsistent answers. And then he goes back to the vehicle and discovers that he has prior at least an arrest. It creates in his mind reasonable suspicion. And then we go through the rest of the and that's why we cite to the Collins case. We believe that is, you know, that one, there wasn't any television or other product within the purview of the vehicle. It was the mere fact that the defendant was giving inconsistent answers that caused the officer to proceed. I would also point out, you know, if we go way back to the training. Don't we have a time frame here? We have an officer going, a trainee arguably, but an officer going up to the car. The stop was for a reason of lane changing, right? No, no headlines. Well, no headlines. Sorry. Okay. No headlines. And he's going up there and he asks a question, you say under Collins, doesn't have to be related to driving behavior, correct? Correct. Okay. And what at that point led to him developing his, quote, something's not right hunch? We would, of course, not agree with hunch. It was reasonable to take suspicion based upon the combination of a nervousness failure to sweating profusely. It's 70 degrees windows down. The air conditioner is going on in the vehicle. That suggests that he is more than just typically nervous. But he's going to be under medication. Well, that's something for the officer to investigate, to ask questions. Really exerted himself trying to get that TV set in the little car. So go ahead. And then on top of that, asking questions about the television. And as I say, it's not real clear from which questions were being asked when they're being asked. Lipscomb is testifying that he asked about the dollar amounts after consent to search have been given. Okay. But we got to go. We can't get down that. Correct. Well, I'm trying to reconstruct what took place here. And that's as part of the problem. Maybe you should focus on Taylor first, because he's the only one who went to the car. Correct. So Taylor goes up to the vehicle. And this is why it's not clear, because during his direct testimony, when he's called by the defendant, he's just testifying as to. Well, I asked him. I asked for his license. I noticed he was nervous. And then he goes back to his vehicle and he finds out about this burglary arrest. But then on cross-examination, he says, well, no, that's what I had before I went back to the vehicle. I was asking about the television. So if you combine these this testimony, it appears that he's already raised his suspicions about the television. Based on the questioning of the people in the latter. Correct. But what about the former testimony? Well, the latter testimony is the cross-examination by the prosecutor. He's going to bring that testimony out, whereas the defendant is not going to bring that testimony out. Well, it seems significantly different, doesn't it? I mean, we've got Taylor going to the car, getting the documents. Correct. Because driving down about driving down the street goes back and then just runs a check. Right. A standard type of check. Well, the Lipson testified that he thought he should run a deeper check, though. Yeah, but we got we got to talk about what that reasonable articulable suspicion was. I mean, when does it have to be developed? It was developed. It's our position it was developed at the time he was going back to the vehicle to run. And what was it that was? The nervousness, the television and the answers about the television. Well, that's if you believe the latter testimony on the cross, right? There's no reason not to. I mean, the judge found the officer's testimony credible. He wasn't going back to the car to run. He was going back to the car and he started writing the ticket. And it was the other officer who had not been there, who didn't talk to him, who didn't see that he was nervous, who decided that there needed to be some further investigation about this TV set. Actually, Lipson testified that he went to the driver's side of the vehicle and while he could not hear what was going on, he could observe the television and he could say all that the defendant was sweating firstly and was acting nervous. So actually, there is a testimony by Lipson about that. When did he go to the car? When at the same time Taylor went to the vehicle, Taylor approached the driver's side. Lipson said he approached his name. I may have been mispronouncing the name Lipson. There's Taylor and then there's three officers. There's Morass. Morass, but Morass was later. Lipkaman. Lipkaman. I'm sorry. Yeah. Lipkaman is the instructional officer writing the ticket. Correct. Right. If we go back and look at Terry versus Ohio, our criminal case on the issue, you look at what Officer McDonald in that particular case had going for him. He observed two individuals, one walking back and forth, and then a third individual come along. They were having this conversation. And Officer McDonald didn't have anything much more to go to than these people going back and forth. When the defendants, Terry and the others, went around this corner to this other shop, that's when the officer approached, asked for their name, then spun Terry around and started patting him down. And it was mere observation regarding the walking back and forth and his general knowledge about criminal. He was signed for 30 years to look for pickpockets and street crime. And that his basis, that was the only basis for his doing the initial Terry stop of all things. Thank you. So, I mean, that is not exactly a lot of information. And we would argue that the information that Officer Taylor and even Lipkaman had in this case was at least as much as Terry. It was in Terry. What you didn't have in Terry was that there was a traffic stop that was the reason for the police encounter in the first place. And the subsequent case law that says that you're supposed to take care of this traffic stop and it's only if something hits you in the face that you can go further than that. And our position is that there was, that Taylor was hit in the face. By what? A television. Pardon? A television. A television, okay. If there are no other questions, we respectfully ask that this court adjourn. Thank you. Mr. Nguyen, do you have a comment? Thank you, Your Honors. Just real briefly, I would just like to clear up the facts first. So, the state says that Taylor went up during the initial approach and asked about the TV. Now, I didn't see that in the record or in my notes, and I did try to get the record to see if I could re-examine that, but I wasn't able to. But in any case. You weren't able to get the record? In preparation for oral argument. Probably because we have it in our office. Yeah. But in any case, whether Taylor had asked that simple question about the TV during the initial approach, what the state says is that he asked, where did you get that TV? And Harvey responded from Walmart. Whether that happened at the initial approach or after the stop was prolonged. What's key here is the suspicion about the TV being stolen didn't arise until the stop was illegally prolonged. That's when officer's arrest came as backup. And the officers re-approached the car, and then when they started searching the car, they noticed that this TV had, there was something odd about the TV. There were stickers on it. There was a bag with a remote control. It looked like it was from a store. And they started asking Harvey about the TV. And Burrass asked him questions. Lipman asked him questions. So all these things that gave rise to the suspicion about the TV, that came after the taint had already occurred. After the stop was illegally prolonged. How do you know it's illegally prolonged? What's our criteria to make that conclusion? Well, Your Honor, so it was illegally prolonged because there's no reasonable suspicion. Because the officers had completed the traffic stop. Tell me when that happened, the completion of the traffic stop. The completion of the traffic stop. And this is what the Supreme Court states in Rodriguez v. U.S. They state that, or they held in that case, that a traffic stop is completed when all the tasks related to traffic safety are completed. So when you, talking to the driver, of course, checking the license, checking for insurance and registration, checking for outstanding warrants. Those things can be done in any typical traffic stop. And those tasks were completed. Well, you left out one. Which is writing a ticket. Yes. That takes a little while, doesn't it? I'm always curious about that. Because you're not completed. It's not completed until you either dismiss the person or you, and part of that dismissal may be with a warning, verbal warning, or with a written citation. Well, I think that's technically true. But the Supreme Court also said that when a traffic stop is also completed, when all those tasks should reasonably should have been completed in this case. How do we know? What's the parameters of should have been done within a time frame? Reasonable amount of time, which is not outlined in the Supreme Court. By the Supreme Court in Rodriguez, at least. They don't have drivers. They don't drive. But I was thinking this case. We don't actually have testimony in this case about how long the stop lasted. But we do know that after they started the ticket, they called for backup. They waited for backup to arrive, and then they re-approached heartbeat. Now, during this time, if they had not completed the traffic stop, I don't know what else they could have done. I don't know why they needed to call backup. The tensions of the officers were clear. The scope of the traffic stop was completed at that point. But they chose to continue the stop. A reasonable person under those circumstances would not feel free to leave. I know there are cases out there where the driver feels that he can leave under those circumstances. The point is here that the stop was legally prolonged because the officers didn't have reasonable suspicion at the time after the initial approach. They were just investigating the traffic stop. They had a weird feeling that something else was going on, but the Supreme Court has made that clear. That's not sufficient to support reasonable suspicion. So I would just again request for the relief that we asked for in our briefs. I just have one more short question. It's still not clear to me exactly when the officers were doing their talking to him. My understanding was that Taylor was the one who was doing the stop. That he talked to the defendant. That he went back to the car to write the ticket. That while he had been doing this, Lipkaman had been sitting in the car making phone calls because he had some kind of a bad feeling. And that Lipkaman didn't go back to the car until after that. Am I wrong about that? My understanding of the facts, and this is from what I've seen in my notes and everything, is just that no conversations about the TV. The phone call, all of that happened after Taylor and Lipkaman re-approached the car. After the ticket was discarded. So any conversation about the TV, at least from what I've seen, is from the record happened after the prolonging of the stop. After that taint occurred. And do you know why they had to call for backup if there were already two of them there? I'm not sure what the police protocol for the Maycomb Police Department is. I just assumed that was for officer safety. But it definitely added time to the duration of the stop. And I think any person under those circumstances would just simply not feel free to leave. They would feel that they are under an extra, I guess, set of investigation at that point. If there's nothing else, again, I request for your leave. Thank you. Thank you, Mr. Neal. Thank you both for your argument today. We'll take this matter under advisement and get back to you with a written disposition within a short day. We'll now take a, not a short recess, but a much longer recess. We'll commence again in November. All right. The court is now adjourned.